Thank you. To continue from where we left off, the next case is number 05-1490, Pharma-Stem Therapeutics against Biosell. Mr. Andre. May it please the Court, Paul Andre representing the appellant patentee, Pharma-Stem Therapeutics. I apologize in advance, I didn't prepare any poetry for today, but I have prepared to talk about a lot of substantial evidence that was presented to the jury in which the jury based its decision on in this case, and that is the sole basis for Pharma-Stem's appeal. Was there substantial evidence to support the jury's verdict? In this case, Pharma-Stem presented evidence in the form of scientific publications, peer-reviewed scientific publications from New England Journal of Medicine and the FDA. They produced internal documents of the company stating that the goals of these companies were to store stem cells in sufficient amounts to reconstitute adults. Are we talking about the 681 patent? I'm sorry, 681 first and 553 after, if that's okay. The internal documents of the defendants actually state very specifically that the goal is to store stem cells in sufficient amounts for therapeutic use, and that therapeutic use is targeted for adults. We have public statements by these companies in the form of advertising and various other contracts in which they tell the public who buy the core blood, the prior preserved core blood from them, that they can be used for adults, parents, grandparents, etc. That marketing material was stipulated to as being truthful, so there's no debate as to what they were actually selling. We also have fact testimony from at least a dozen witnesses talking about the business plan of these companies, that they collect the core blood to be used for future therapeutic use, and that use can be for adult use as well. And then finally we have expert testimony. The marketing didn't guarantee that it would be useful for reconstitution for adults, correct? That's correct. It suggested that that was a possibility. It is. There was some of the marketing that actually said it can be used. It can be used. There are no guarantees. The guarantee in transplant medicine is nonexistent. The fact of the matter is you can have more than sufficient number of stem cells and not be successful. It's just because of the various nature of transplant surgery or transplant procedures. You never know. So there are no guarantees, and no one would be foolish enough to make a guarantee. But they did say on several of their marketing material they can be used for the adults, it can be used for the mother, it can be used for the parents, grandparents, et cetera. So how do we know if there's infringement up until the point at which it's got to cover adults and you don't know until you actually try the transplantation? How can you determine infringement other than waiting enough time so that there's actually a successful transplantation for adults? The claims of the 681 patent require a sufficient number of cells. It's not a successful transplantation. Well, what is that number, stem cells or progenitor cells? The claims are called for a sufficient number of stem cells. And how that is determined. And what is that number? You cannot count stem cells. You can look at the surrogate assays that were used for the first time in stem cells to show transplantation that the inventors came up with. The surrogate assays can be in the form of colony-forming unit assays, they can be total nucleate cells, they can be CD34, they can be volume. So different parties use different surrogate assays. But those assays are discussed in the patent, and the company defendants in this case actually set their standard operating procedures to actually screen those type of assays to ensure that they had a sufficient number of cells. So the question here is... Is that correct? It was the screening to determine the sufficient number of cells for transplantation to adults? It was for therapeutic utility. Isn't there a difference between therapeutic utility and successful transplantation into adults? In this particular instance, there's not. Why not? I thought the reason you got a patent and the only reason we're here is because you limited your patent to use by adults. The adults obviously cover children as well. Does the patent cover just adults? It covers adults and children. There has to be a sufficient amount for adults, but also that would be a sufficient amount for children as well, obviously. But it has to be a sufficient amount for adults. That's correct. That's all your patent covers. If it's insufficient for adults, it's not covered by the patent. That's correct. Okay, so how do we know, based on, you said, the test they conduct, that that test tells you definitively that there's a sufficient amount of stem cells for adults? The evidence that was presented to the jury and the substantial evidence the jury relied upon was based on the scientific publications where they did large clinical studies using adults. Then the medical advisory boards of these companies set up a number to be therapeutically useful, and they sell their product to be used for adults. So there is a logical inference that if they're selling their product to the public, saying that you can use this for adults, and we will tell you that we will screen to make sure that you do have a sufficient number of stem cells, then a logical inference can be drawn that their screening procedure is screening exactly for that. Well, that might be true if they guarantee that whatever they sold would be therapeutically useful for adults. But as you acknowledged earlier, there's no guarantee. So I'm having a hard time. You concede that you're drawing some sort of line here between we're going from therapeutically useful to necessarily working successfully for adults, right? The scientific publications get made at the same standard. Once you reach a threshold amount, a therapeutically useful amount, then that should be used for adults. And that's what the FDA paper said as well. But we don't know what that amount is, right? Well, you can't count stem cells. That's correct. So we don't know what the amount is. So when you're saying that the other side is a threshold matter, whether they were useful, had determined they were therapeutically useful, but you're conceding that their determination of therapeutically useful didn't involve knowing how many stem cells were within. And that's the basis for the surrogate assays. The surrogate assays are used by doctors every day. There have been thousands and thousands of transplants into adults of these types of stem cells. And stem cells have never been recounted. But those surrogate assays they use allow doctors to make life and death decisions as to the matter of fact that they do believe there is a sufficient number of stem cells in there based on these surrogate assays. So what these companies did was set up these types of surrogate assays that would actually allow them to make a determination whether they'd be therapeutically useful or not. And if you tie that together with what the evidence and jury heard, then there's a logical inference that a reasonable juror could not only conclude that those samples that passed the screening that their medical advisory board set up had sufficient stem cells, it's almost an impossible inference to escape from. So in this particular instance, the evidence that was put forward, and it was all cited in our briefs, there was just more than substantial. There was overwhelming evidence that would allow a reasonable juror to make that conclusion. With respect to the 553 patent, it's undisputed that this is the method patent. There are several steps, and it's undisputed that all these steps are performed when a core blood sample is transplanted into anybody, adult, child, or whatever. There's no dispute as to that whatsoever. The jury was presented with three very specific factual questions that were proposed by the defendants. They had to answer, and they affirmed it, to find contributory infringement. That was the no non-infringing use, the fact that it is sold as a cryopreserved unit, that it is sold to a third party for direct infringement. And the questions are three through five on the jury verdict form. The jury answered all those affirmatively, finding that there was contributory infringement. The sole basis for setting aside that from the district court's perspective was a definition of cell that required ownership or title. Now, is this court... Well, we'll look at cell to whom. Wasn't that also a question about who... Wasn't it sale to the family or sale to the transplanter? The district court set aside the jury's verdict based upon the sale to any third party based on the jury verdict form. The district court didn't even mention the jury instruction. So the sole basis was the definition of cell, which is the whole ownership. And the sole basis of setting aside was that since the defendants do not have ownership of these cord blood samples, they cannot sell it. While it's questionable whether they have ownership or not, the fact of the matter is that that restricted definition of cell has already been rejected by this court in, I believe, this last year, year before last case of the NTP versus the RM case, in which cell was defined pursuant to Black's Law Dictionary, which is a transfer of title or possession. You just transfer it for a price. So the district court setting aside based on that is clearly error. You didn't argue, did you, that it was a sale that constituted a sale of a service, correct? You weren't arguing that it came under 271C as a sale of a service. It was an alternative theory to advance the trial. That's correct. So we believe that a sale of a service is also covered in 271C, and that was argued in the alternative trial when we got the jury instructions in the verdict form. We also believe that the jury did have reasonable and more than substantial evidence to show that there is a sale of the Carpenter Corp blood unit to a third party. I'd like to reserve my time. Yes, we'll save your rebuttal time, Mr. Unger. Mr. Rogers? Hi. I'm Mr. Unger. Thank you, Your Honor. Thank you. And may it please the Court, I represent the defendant by itself, but I'm speaking on behalf of all the defendants here today. If there are very specific factual questions, they may need to address them. Otherwise, I'm going to take the entire time. When you get into the thrust of your argument, let me ask you about the cross appeal. Were the invalidity issues presented as a counterclaim in the original case by anyone, or were they simply defenses? Your Honor, when I heard that question earlier today, I tried to check the record. We do have counterclaims, but we had antitrust counterclaims. So looking at the record quickly, I'm not sure. I believe we have declaratory judgment counterclaims on invalidity. There's nothing in the judgment that would so indicate. The district court's judgment is simply on infringement. Your Honor, I'm sorry. I should know the answer to the question, but I don't as I stand here. My understanding of the law, however, is that whether this issue was raised by counterclaim or not, this court still needs to address that issue, even if it were to affirm on non-infringement. Well, where do you get that? A series of cases which I read recently which say that, I believe. Even if there's no defense? Even if there's no counterclaim, that's correct, Your Honor. That's my understanding. Bill Rahm, do you know that case? Was that one of the cases you read? Because that case, which I wrote, says, I think, pretty much the contrary to the proposition you just articulated. And it's about four years old. And the notion is that if all you've done is to raise a defense, and if you prevail on infringement, let's say, that leads to upholding the judgment of infringement, there's no need or justification to go on and decide something else that would give you relief that you never sought in your complaint or in your counterclaim. I understand the point exactly, Your Honor. And I can say that I did do research on this issue because I was concerned about it before I came. Obviously, it wasn't addressed in any of the briefs. And I saw a series of cases which I read to hold pretty clearly that this court needed to address validity. And they did not, to me, turn on the question of whether we had a counterclaim or not. I would like the court's indulgence to spend a page on that afterwards. Yes, of course. But when there is an issue of infringement, and even if we were to decide that there is no infringement, nonetheless, we have held that the Supreme Court told us in Cardinal Chemical that we needed to review a district court's decision on validity. But here, there was no district court's decision on validity, was there? Oh, yes, sure, there was. There was. The jury verdict came. But it wasn't appealed. We cross-appealed it. Not a separate counterclaim, though, of validity, was that in the form of a defense, so far as we understand. I'm uncertain on that. And I have a memory, because I was trial counsel and I was involved in this, that when we saw the judgment, we asked the question whether or not there was some kind of declaratory judgment issue that needed to be addressed. And, Your Honor, I'm just not replying. I apologize. If I could, I had three points that I wanted to focus on today. The first is, as the 681, that J. Maul was appropriate in this case. And the fundamental and root reason for that is that there was no expert testimony given on the critical claim element, the amount sufficient, stem cells, in an amount sufficient to affect the model of reconstitution of a human adult. Faced with that science-based claim language, you would have expected someone to provide a standard, what is the amount sufficient for an adult, to look at the individual units stored by the defendants, compare them to the standard, and say, these have it, these don't, or they all have it. There was no such testimony in this case. The only expert testimony focused on marketing materials. And, actually, that expert testimony was excluded after trial by the district court under Daugherty. The second point I want to focus on, and these are related, I understand, the claim language is indefinite. And there are really two pieces to the indefinite argument. The first piece is, to the extent it claims stem cells, it's admitted and undisputed, you cannot identify or quantify a stem cell. So the only way that there could be content given to this claim language would be to go to some kind of surrogate, something that suggests stem cells. Now, Mr. Andre, for the first time today, in this entire litigation, has said we're relying on surrogates, which is fascinating to me because we have had this issue front and center since we tried to file letter briefs on summary judgment years ago. The reason that there's a real problem with going to surrogates is surrogates are expressly disclaimed over and over and over again in the prosecution history. In the prosecution history faced with prior art that addressed progenitor cells. In other words, there's lots of prior art where cord blood was taken and examined and shown to have progenitor cells. And over and over again, in order to distinguish that prior art, the patentee said, those assets for those kinds of cells do not demonstrate stem cells. There is no way on this record, on this intrinsic record, that the court can construe the amount sufficient language to be as encompassing a surrogate, i.e. progenitor cells or volume of cord blood, that shows stem cells because that was repeatedly disclaimed in the prosecution history. I can give an example of the kinds of language that was used. But wouldn't that relate to when or at what stage one might determine whether there is in fact an infringing composition? Well, but I'm on the indefiniteness point here. Indefiniteness is determined as of the time of filing. And so the prosecution history on this point says over and over again, progenitor cells are not indicative of stem cells. So we can't construe the claim. Exxon, I think, Your Honor, is the closest case for that. But you're construing for the purpose of determining infringement. Well, but for the purpose of determining infringement, if a standard were put forward that construes the amount sufficient language as being represented by a surrogate, if that was the claim construction, obviously not the claim construction the district court adopted here. The district court didn't adopt any standard as much as is needed. But if the court were to construe that language as providing a standard, I say that language, that standard is disclaimed. Because in the prosecution history they said over and over again, progenitor cells are not indicative of stem cells. They can't then turn around and say, this claim language means that if you have a certain number of progenitor cells, then you have the amount sufficient. Because they've told the patent office, in order to get their patent, progenitor cells are not indicative of stem cells. They can't switch like that, and they've never made this argument. But you're saying under the infringement issue, not the indefiniteness issue, the only way they could prove up infringement was once the cord blood had been transplanted successfully into an adult that had been stored. Then they could come in and say, yeah, that infringes. We've never taken that position, although that is a position that I suppose could have been taken. Nor have they taken that position, because the reason for that, I'll submit as clear, my client. Well, I know why they haven't taken it. Well, they haven't taken it because we've never transplanted an adult. So they would have zero infringement under that standard. But these two are related, obviously, and that's sort of the way the case has proceeded. Either it's indefinite because there is no standard, or if someone comes up with a standard, which is a surrogate, which I say you can't do because it's disclaimed. Then you needed to take that standard, and you needed to apply science to it. You needed an expert. This is very similar on the infringement side of this case to the centricate case that Judge Dyke wrote, because you would need to look at individual units, and you would need to ask the question, what is the cell content and how does that compare to the standard? And they didn't do that. They had no expert testimony at all. They eschewed it. Can I just ask you about the contributory infringement, the 553 patent? Is it your view or do you know? It's my understanding that our case, we've never decided the issue of whether or not sale of a service is covered or is not. Can you confirm that, or do you think we've decided that it is? I don't think this court has decided the issue. I don't think this court needs to reach the issue. The 553 argument is very straightforward and simple. It's based on the jury instruction, which was not objective to it. The piece of the jury instruction that was not objective to said they must show a sale or offer to sell to a transplanter. They objected to the sale or offer to sell part of that. There was a lot of argument about that. We think that's clearly right under the contributory infringement statute. They actually proposed the language to a transplanter, and there is no evidence at all of any sale or offer to sell to a transplanter. Therefore, under the jury instruction as given, there was no evidence that would support the jury verdict. It's that straightforward. That means you don't have to address the issue of sale of a service. We did brief the issue, but you don't need to reach it because they can't cite any evidence of a sale by the banks to the transplanter. We have the blood. It's cryopreserved. It's stored, and the family then says, the family owning the blood, release it to the transplanter at a particular time. But you don't think there's a sale to the family either. You don't think it's sufficient for a sale. You just think it's stronger for the transplanter than for the family? I think you just don't need to reach it. We don't believe there's a sale to the family either. It's a matter of quantum, isn't it, and of the amount, the evidence of damages. It doesn't really go to the issue of whether, in fact, when there is a transplant, whether the conditions of the claim are being met. I disagree, Your Honor. We're talking now about the 553 method patent, and what I'm saying is that the instruction to the jury on whether the method patent was infringed required a— because it was a contributory infringement theory on the 553—required a sale or offer to sell to the transplanter, the transplanter being the last entity that performed the final step of the method. On the principle that once we have it in our freezing units, there it stays forever and will never be sold? We don't—the point is there's no sale. See, the contributory infringement statute only talks about a sale or offer to sell, not make you sell or offer to sell. Very specifically, Congress limited the contributory infringement statute only to sales or offer to sell. We don't sell. That's undisputed. Not to the transplanter, we don't sell. Because we're banking for the family, and when the time comes to use it, we're simply asked to release it. There's nothing that could support the notion that it's a sale. There's no money exchanging hands. There's no traders. This is an ill-mercenary charitable activity? No, we're not selling to the transplanter. Somebody argues that we—obviously, we provide something to get paid for. It's to the family. We provide a service to the family. But the jury was instructed, and there was no objection to it, that they needed to prove a sale or offer to sell to a transplanter. No evidence. You were going to ask? No, I think it's probably not worth taking up any time. Let me ask you, if you would, to speak to the question of validity of the 553, in particular attention to Kawiki, Indy, and Vidal. If I could just make one more point very quickly, which is regardless of how this court comes out in JMOL, the verdict cannot be reinstated. There are two reasons for that. One is the exclusion of Hendricks after trial. And the second is the judge's finding that the 100% infringement was against a great weight of the evidence. So I just want to make sure that under no circumstances can the verdict come back and be reinstated. You mean there would be a reinstatement of the judge's original new trial order? That's a way of looking at it, Your Honor, yes. I mean, wouldn't that be practical impact of what would happen? I think if you were to refuse the JMOL, you would have to go back for a new trial for those two reasons. Both of those are discretionary decisions within the district court's discretion. But that would be something we would have to say to the district judge. You now have the case back, and you decide what to do with it. Because district judge might have a different view of it depending on anything we might say, I suppose, in the opinion. Understood. Can I address a Kawiki? Sure, if you would, please. The Kawiki argument is, again, it's also very straightforward. And it's as simple as this. Kawiki, he took umbilical cords, and he froze the entire cord. And that's what he taught that he did. That inherently must happen, each and every element of the patent. Because the patent describes exactly the same thing. In other words, the patent says, take the blood from the umbilical cord, pry or preserve it. And then the patent adds some claim elements to that. It says, and have stem cells in an amount sufficient for an adult. But the point is, Kawiki did exactly what the patent taught. And he taught exactly what the patent taught. Very similar to Christopher Sprouts in this way. Umbilical cord blood has been around forever. The umbilical cord blood has stem cells. It was admitted at trial by their expert. Yes, we know now that there were stem cells in those umbilical cord units. That's it. And there is really no difference. And there's been no suggested difference in Kawiki's methodology, in what Kawiki taught. What about the enablement issue in connection with the various prior references? Kawiki does say, may be useful as one of the sources of hematopoietic progenitor cells for marrow transplantation. Of course, progenitor cells presumably was the expression that was used in the absence of knowledge. He actually used pluripotent progenitors at another point. And the testimony was those are stem cells, but that was disputed. Okay, alright. But in any event, so there's a reference to the transplantation, but there's no, the argument, as I understand it in part, on the other side, is that there was no enablement of the patented invention. Agreed. I guess there are two points here. First of all, that enablement argument only goes to the 553. The 681 is a composition claim. And enabling the composition is right there. And Kawiki is saying I created these compositions. Right, but we're talking about the 553. So we're talking about the 553. As to the 553, the enablement argument that they made, if you look at Dr. Bernstein's testimony, was that it wasn't enabled because people wouldn't have believed there were stem cells in it until somebody actually did an injection and a transplant. Now that argument, I submit, is really an end-around inherency. We know that there were stem cells in it. And so the enablement argument is just an attempt to end-around inherency. We know that enablement under 102 is different than enablement under 112. The suggestion is enough. It's clear in this court's opinions. And so what we have here is clearly the suggestion. So the question is what's not enabled? Because the only element that isn't inherent is injection into a human. That's it. That's the fourth element of the method. And the evidence on that is what you do is you hook up an IV. And they knew how to do that because they transplant bone marrow all the time. And if you re-co-weak it, that's clearly what he's doing. He's comparing this to bone marrow. He's saying is this good enough as bone marrow is? So what's not enabled would be my question. And the question I think Your Honor would ask is was there evidence on that? And I would say no. Now there's an issue as to who has the burden. But there's no evidence from their side explaining what's not enabled about that particular claim element. Now one further question. This is a very lengthy patent, 64 columns I think in both cases roughly. And I labored through all 128 columns. Actually, I didn't. I cheated. I read only one of the specifications. And I was looking for what was in the patent that wasn't either an explicit reference to prior art or wasn't effectively covered by some of the prior art references that are in the record. What I did find was the mouse examples, which appeared to be new. Is it your view that there's anything else of significance? I wasn't sure about the essays. But is there anything other than the mouse examples? And please tell me about the essays, whether this is new in the patent. It wasn't in the prior. The essays are identical. You can literally put them side by side. All right. The mouse studies, this was an argument that was made. And what I will say on the score, I'll try to be as sort of clean as I can. The mouse studies weren't new. Someone named Barnes did identical mouse studies 20 years earlier. And that was in evidence at trial. There was no rebuttal to Barnes. In other words, Barnes was presented by Dr. Wagner, our expert. There was no rebuttal to Barnes. However, we're now in obviousness land, I suppose. Because now we're trying to combine references. And I'm not trying to combine references for the anticipation argument, at least. So what I would say to you is I don't think the mouse studies get around the anticipation of Kawiki. Because if anything, what they proved is that there was reconstitution using neonatal blood in an animal. But to the extent that that's what was relied on, it's not new. It was done 20 years earlier.  Thank you. Thank you. Yes, I'll do that before we adjourn. Good. Mr. Andre? Thank you. One of the things that the court probably noticed about the defendant's argument here today and also in the brief is they talk about what was not presented at trial and what should have been presented at trial. They do not focus at all on what was actually presented at trial and what the jury relied upon in coming down with this verdict. A very detailed special verdict form that was prepared by the defendants, making infringement very difficult and invalidity very easy. The jury went through that special verdict form based on the substantial evidence and found that the patents were valid and infringed. Judge Brooks asked about the cell in the 553. Counsel said it's all about the jury section, cell to a transplant. But if you look at the actual special verdict form, it says cell to a third party. There is a contradiction. And under the doctrine of invited error, if the jury's verdict can be reconciled, then it should be so. There is clearly a cell to a third party, and we would even argue that there is a cell to a transplant if the transplant is an agent of the family, which obviously they are. They're doing a service for the family. Can I ask you just a question about that since you're talking about the jury verdict? So on that number, question 15, when they talk about 553, the question is what is the number of units that infringe? Can you enlighten me as to, other than out of thin air, where they got these number of units? I mean, were these numbers on one side or the other presented? They were the ones that were presented by the defendant's expert witness. And what did they represent? They represent the actual number of core blood units that were transplanted. The number that were transplanted? Yes. So these are the ones that actually went through the entire four-step process of being collected, cryopreserved, thawed, and transplanted for hemopoietic reconstitution. And all the numbers and the damages came from the damages expert with the exception of the royalty rate. With respect to the quickie reference, let me take one step back from the surrogate assets. These are pioneering patents. No one had ever shown that stem cells were in core blood. They suspected it, but it was never shown. There was the mice studies that were quintessential to show that they were actually there. They had very specific genetic strand of mice that were needed to show this. One of the inventors happened to invent a strand of mice that you could show that the stem cells that they were recovering from were actually transplanted stem cells or certain genetic markers. That was key to this whole process. There's no way that a physician is going to inject core blood into a patient once their bone marrow has been ablated. In fact, if you look at the prior art, this dates back to 1974, 1979, 1981, 1983. There were no transplants. Even though thousands of people were dying every single year because they could not get stem cell transplants, no one was willing to try this. That's the reason the prior art does not demonstrate stem cells. It doesn't demonstrate stem cells. It's true that Koike doesn't mention stem cells, although Vidal does, and that's prior art. It is. I'm sorry. I don't understand what significance there is in the fact that as a matter of scientific proof, there was a failure to demonstrate that there was something in there that was therapeutically effective that was called stem cells as opposed to simply knowing that it was therapeutically useful. Because no one had ever taken those cells and core blood and transplanted them to an animal or human and obtained long-term hematopoietic reconstitution. So does it come down to the mice? The mice were one of the key factors. Is that what your contribution was, is to go from Koike? Is the mice examples, was that really the major step that gives you an advance over Koike and Vidal? Well, there are several. With Koike, for example, Koike only froze down one milliliter of cells. Even a technical expert stated that would not be anything therapeutically useful. So there's no inherency argument. Koike actually taught away from using stem cells. Because if you look at Koike's recovery rates, when they cryopreserved the cells, over 50% of them were not able to be revived. So what Koike actually did and what the other prior art actually did was actually teach away from transplanting. Because you get a small volume anyway of this core blood. And all that prior art taught that when you cryopreserve these cells, the recovery rates were very low. Sometimes even down to like 20%. What our inventors were able to do was to actually show that when you actually cryopreserve these cells, you can use a smaller amount. And they demonstrated this by collecting over 100 full core blood samples, collecting the volumes of the cells and all the assays. They did animal studies. And with the 553, they actually did the very first core blood transplant. That's not disputed. In a human? In a human. In eight years after the application? It was a CIP application. It was not at the time of this application. Nothing had been done other than mice. On 553, it was a CIP in which there was actually a human transplant. It's in the actual application itself. It's the last column that was added in. The 553 patent has the human transplantation in it. So that is a big distinction between all the prior art. Okay. Before we adjourn, I do have a question. I don't know which of you might answer it. But will you find for us and point us to where in the record the issues of validity were raised, whether by counterclaim or affirmative defense? Is this something that we should ask you to do? Your Honor, I'm happy to do it. I have reserved two minutes for a model. Yes, all right. But you'll make a note also to provide us with this information? Absolutely, Your Honor. A letter would be sufficient. That would be fine. And please check with Mr. Andre, sir, that if he wants to argue with you about something, you can put it all together. Okay. Okay. Just on the cross appeal. Just on the cross appeal, then, I will address one issue, which is Mr. Andre said that Kawiki only froze one milliliter. And, in fact, the evidence on that is that he froze the entire cord. There are two pieces of evidence on that. The first is Dr. Wagner's testimony. That's the appendix 3803, where, on redirect, he says, what is the observations made in that article? As you understand it, as a person of ordinary skill would have it, well, you have it here. A portion of each of the samples was cultured, and that is what all the tables are on. However, it says the rest was processed for cryopreservation. So he stored the rest of it. So Kawiki stored the whole. And, in fact, if you look at appendix 13346, which is the Kawiki article, you'll see that that's what he says he did. So to the extent there's anything here that turns on whether he only froze one milliliter of blood or whether he froze the entire cord, he clearly froze the entire cord and taught that you would freeze the entire cord. There was one issue back on infringement. Am I not allowed to address that? We assume that it's well covered in your brief. I believe it is, Your Honor, but it is important going to the issue of what those tests that we did show. And it's pretty clear in our brief what we say the evidence was on our tests. Thank you. Thank you. Thank you both. The case is taken under submission.